IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BYRON E. ADAMS, | ) |
|       Plaintiff, | ) |
| vs. | ) Case No. 3:14-CV-366-NJR-DGW |
| RICHARD HARRINGTON, SAMUEL NWAOBASI, and BRADLEY J. STIRNAMAN, | ) |
|       Defendants. | ) |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Now pending before the Court is a Motion for Summary Judgment filed by Defendant Samuel Nwaobasi on May 16, 2016 (Doc. 101) and a Motion to Strike Reply filed by Plaintiff Byron E. Adams on October 21, 2016 (Doc. 120). For the reasons set forth below, the Motion for Summary Judgment is granted, and the Motion to Strike is denied.

### INTRODUCTION

This matter is proceeding on a second amended complaint filed by Plaintiff, Byron Adams, on October 6, 2014 (Doc. 34). Adams is an inmate in the Illinois Department of Corrections who was formerly incarcerated at Menard Correctional Center in 2013 and 2014. He alleges that the floor of his cell at Menard was so hot that it caused second degree burns on his feet. Adams is particularly susceptible to such burns because he has diabetes and suffers from diabetic neuropathy in his feet. As a result of the burns, Adams's big toe was eventually amputated.

Adams is proceeding on Count 1 for deliberate indifference to serious medical needs against both Richard Harrington, the former warden at Menard, and Samuel Nwaobasi, a physician at Menard. Adams alleges that Warden Harrington was both aware of his medical condition and the condition of his cell but did nothing to alleviate his health concerns or living conditions, and Dr. Nwaobasi was deliberately indifferent to his medical condition. Adams also is proceeding on Count 2, a claim for excessive force against Bradley Stirnaman, a correctional officer at Menard. Adams alleges that C/O Stirnaman harassed, battered, and assaulted him while he was housed in the healthcare unit.

Dr. Nwaobasi filed his motion for summary judgment as to Count 1 on May 16, 2016 (Doc. 101).[1] The motion was then stayed while Adams conducted expert discovery (Doc. 106). Dr. Nwaobasi filed a supplementary memorandum on August 29, 2016 (Doc. 109). Adams filed a response in opposition to the motion for summary judgment (Doc. 116), and Dr. Nwaobasi filed a reply (Doc. 117). Adams then filed a motion to strike Dr. Nwaobasi's reply brief (Doc. 120), to which Dr. Nwaobasi filed a response (Doc. 121).

## MOTION TO STRIKE AND EVIDENTIARY ARGUMENTS

Adams first objects pursuant to Federal Rule of Civil Procedure 56(c)(2) on the basis that the evidentiary material attached to Defendant Nwaobasi's motion is inadmissible (Doc. 120). In particular, Adams argues that his medical records are

---

[1] Defendant Harrington also seeks summary judgment on Count 1 (Doc. 110), but his motion will be addressed in a separate order. Defendant Stirnaman did not file a summary judgment motion.

inadmissible hearsay, because they have not been authenticated, and that Defendant's expert report issued by Dr. John S. Daniels is inadmissible because it also has not been authenticated via an affidavit. Both the medical records and expert report can be readily authenticated, however, and would be admissible at trial. Medical records are exceptions to the hearsay rule, *see* Federal Rule of Evidence 803, and Adams has presented no *Daubert* motion that would render Dr. Daniels's expert opinions inadmissible. Accordingly, the Motion to Strike (Doc. 120) is denied.

In deciding Dr. Nwaobasi's motion for summary judgment, the Court will consider Adams's medical records, Dr. Daniels's expert report, and Dr. Marla S. Barkoff's expert report (Plaintiff's expert) and give due weight to each piece of evidence. The Court also will consider Defendant Nwaobasi's reply brief; while the document itself is fifteen pages, the argument section is only five pages, and exceptional circumstances exist for the filing of the reply.

**MOTION FOR SUMMARY JUDGMENT**

**A. Factual Background**

It is undisputed that Adams has suffered from diabetes mellitus since at least 2012 and from diabetic neuropathy. Diabetes is a "chronic metabolic disorder . . . caused by an absolute or relative deficiency of insulin and is characterized, in more severe cases, by chronic hyperglycemia, glycosuria, water and electrolyte loss, ketoacidosis, and coma." STEDMAN'S MEDICAL DICTIONARY 529 (28th ed. 2006). In layman's terms, diabetes means that one's blood sugar is too high, causing various conditions including heart disease, and relative to this case, lack of sensation in the extremities, *i.e.*, diabetic neuropathy. *Id*.

1313. This can in turn lead to various adverse consequences, including the amputation of digits. It is common knowledge that diabetes is a disease that requires management. Most persons who suffer from diabetes check their blood sugar levels regularly. They also undergo A1C testing, which provides an average blood sugar level for multiple months,[2] and take medication in the form of pills and/or insulin shots designed to lower or counter the effects of elevated blood sugar. Diabetes also requires an appropriate diet and exercise in order to avoid or minimize adverse consequences. (*See* Doc. 116-2, p. 12; Doc. 109-3, p. 6). There is no cure for the disease; however, if appropriate steps are taken, it can be managed successfully.

Adams was incarcerated at Menard from January 9, 2013, to June 11, 2014 (Doc. 111, p. 2).[3] During this time period, the medical records reveal that there were numerous medical service providers who were involved in his care, including Dr. Robert Shearing, Dr. Samuel Nwaobasi, Dr. John Trost, Dr. Fe Fuentes, and Nurse Practitioner R. Pollion.

When Adams first arrived at Menard, Dr. Robert Shearing initially ordered Glipiride and Metformin for his diabetes, but apparently did not believe that insulin was required (Doc. 102-4, p. 1). Dr. Shearing also ordered weekly accuchecks of Adams's

---

[2] The A1C test is a blood test that provides information about a person's average levels of blood sugar over the past three months. National Institute of Diabetes and Digestive and Kidney Diseases, *The A1C Test & Diabetes*, https://www.niddk.nih.gov/health-information/diabetes/overview/tests-diagnosis/a1c-test (last visited Jan. 24, 2017). The A1C test is the primary test used for diabetes management and diabetes research. *Id.* An A1C level below 5.7 is normal. *Id.* An A1C level of 6.5 or above is indicative of diabetes. *Id.* Generally, it is recommended that individuals with diabetes maintain an A1C level of 7 or below. *Id.* However, an A1C level between 7 and 8, or even higher in some circumstances, may be appropriate for some individuals. *Id.*

[3] He may have been transferred to Stateville Correctional Center for a short period of time from March 3, 2013, to April 17, 2013.

blood sugars and ordered Adams to be added to the hypertension and diabetes clinics (*Id*. 4, 10).[4] On January 11th, two days after arriving at Menard, Adams reported to a medical technician that he was not getting his insulin (*Id.* at p. 2). The medical technician asked for a physician to review his chart and order the insulin (*Id.*). The following day, Dr. Nwaobasi conducted the chart review and ordered Adams to be seen in "combo clinic for further assessment and [follow up]" (Doc. 102-4, p. 2; Doc. 116-2, p. 6). The combo clinic occurred every two to three months and was for hypertension and diabetes check-ups and care (Doc. 102-1).

On April 26, 2013, Adams was seen by Dr. Fe Fuentes for blisters on the balls of his feet, possibly from "ill-fitting boots" (Doc. 102-4, p 3). Treatment was ordered for two weeks (*Id.*). At that time, Adams's A1C was noted to be 8.1 (*Id.* at p. 4). Dr. Fuentes referred Adams to Dr. Nwaobasi for a follow-up appointment (Doc. 116-5, p. 21). Dr. Nwaobasi spent most of his medical career as a general surgeon and trauma surgeon (Doc. 102-1). While working at Menard, he did "a lot of small outpatient surgical procedures" that could be done under local anesthesia (*Id.*). On May 17th, Dr. Nwaobasi noted in the medical record that Adams had "bilateral feet ulcers secondary to diabetes mellitus" that "need to be evaluated for further care" (Doc. 102-4, p. 5). The next day, Dr.

---

[4] Accu-Chek is a particular brand of at-home blood sugar monitors. It appears to the Court that the brand name Accu-Chek has been genericized as "accuchecks," which is commonly used to refer to a blood sugar measurement taken by pricking the finger to obtain a blood sample and then using a glucose meter to measure the sample's glucose level (much like the brand name Band-Aid is now used to refer to any adhesive bandage). For individuals with diabetes, the recommended target blood sugar level is 80 to 130 right before a meal, and below 180 two hours after the start of the meal. National Institute of Diabetes and Digestive and Kidney Diseases, *Know Your Blood Sugar Numbers: Use Them to Manage Your Diabetes*, https://www.niddk.nih.gov/health-information/diabetes/overview/managing-diabetes/know-blood-sugar-numbers (last visited Jan. 24, 2017).

Nwaobasi saw Adams and debrided the wounds on his feet and changed the dressings (*Id.* at p. 6).[5] He ordered dressing changes every other day and a follow-up "by MD in one month for re-evaluation" (*Id.*). A few days later, Adams's A1C was tested and measured 8.4 (Doc. 109-10, p. 5). Adams was seen by Dr. Fuentes on July 1, 2013, and while the record is mostly illegible, it indicates that his "foot ulcers healed" (*Id.* at p. 7). By August 2013, Adams's A1C was decreased to 7.0 (Doc. 109-10, p. 10). Adams refused A1C testing in November 2013 (Doc. 102-4, p. 11).

In January 2014, Adams began having problems with his feet again. He was admitted to the Health Care Unit on January 28th by Dr. Trost with second degree burns and blisters on both of his feet (Doc. 102-4, p. 13). Adams notified prison staff that the injuries were caused by the hot floors in his cell (Doc. 102-3, p. 4). Adams stayed in the Health Care Unit for the next thirty-six days. On his second day there, Dr. Nwaobasi was asked to see Adams (Doc. 102-4, p. 14). The doctor noted a history of diabetic neuropathy, and debrided and dressed his wounds (*Id.* at p. 14). The next day, Dr. Nwaobasi again debrided and dressed Adams's wounds (*Id.* at p. 15). Over the next five days, Adams's wounds were evaluated twice by Dr. Trost and once by Dr. Fuentes (*Id.* at pp. 16–18). Dr. Fuentes referred Adams to Dr. Nwaobasi to once again have his wounds debrided on February 4th (*Id.* at p. 18). The wounds were then evaluated by Dr. Fuentes on February 6th and by Dr. Trost on February 7th (*Id.* at pp. 20, 21). On February 8th,

---

[5] Debridement consisted of opening the blister, removing the skin, washing the wound, applying an antibiotic ointment, and wrapping the wound (Doc. 116-5, p. 28).

Adams saw Dr. Nwaobasi, who noted that the wounds were "healing satisfactorily" (*Id.* at p. 22).

Over the next ten days, Adams's wounds were evaluated on three occasions by Dr. Trost and on three occasions by Dr. Fuentes (*Id.* at pp. 23–28). On February 18th, Adams saw Dr. Nwaobasi to have his wounds debrided for a fourth time (*Id.* at p. 29). Dr. Nwaobasi noted that the wounds on both feet were "drying up," and there was "no evidence of [a] secondary infection" (*Id.*). Adams saw Dr. Nwaobasi again the next day for a dressing change, and the doctor noted that the wounds on Adams's left foot "continue to show visible progress" and the "decubitus ulcers are healing well" (*Id.* at pp. 29, 30).

Over the next five days, Adams's wounds were evaluated twice by Dr. Trost and once by Dr. Fuentes (Doc. 102-4, pp. 31–32; Doc. 102-5, p. 1). Then on February 26th, Adams saw Dr. Nwaobasi, who noted that Adams's burn wounds were "healing" (Doc. 102-5, p. 2). On Wednesday, March 5th, Dr. Nwaobasi noted that Adams was "stable and able to ambulate on his feet," and Adams was discharged from the Health Care Unit with various permits, including slow walk, low bunk/gallery, medical lay-in, and food in cell (*Id.* at pp. 3–4).

Within a few days, however, Adams again presented to the Health Care Unit with "new blisters" on the heel of his right foot and the ball of his left foot (Doc. 102-5, p. 5). Dr. Nwaobasi initiated the same treatment regimen—debridement and antiseptic washes (*Id.*). Dr. Nwaobasi did not mention in the medical record that these new wounds were the result of burns, however, this was noted by a nurse and later by Dr.

Trost (*see id.* at pp. 5, 6, 9). On March 13th, Adams was admitted to the Health Care Unit for a security hold (*Id.* at p. 6). Over the next week, he saw Dr. Trost on two occasions before seeing Dr. Nwaobasi again on March 22nd (*Id.* at pp. 7, 9, 10). Dr. Nwaobasi debrided the "diabetic ulcers" on both of Adams's feet and changed his dressings (*Id.* at p. 10).

On March 25, 2014, Dr. Fuentes noted Adams's accucheck reading was high and ordered an A1C test (Doc. 102-5, p. 11). However, Adams refused to have his blood drawn (Doc. 102-12, p. 2). On April 2nd, Adams was presented with a memo in response to his "concern regarding the burns to [his] feet and the healing process" (Doc. 102-7). The memo instructed Adams that to assist with his healing he needed to limit ambulation and control his blood sugar, including "minimizing the amount of commissary foods that are high in carbohydrates and sugars [and] [comply] with finger sticks and insulin administration" (*Id.*). That same day, Dr. Nwaobasi debrided the ulcers on Adams's left foot under local anesthesia (Doc. 102-5, p. 15). The following day, Dr. Nwaobasi debrided the ulcers on Adams's right foot (*Id.* at p. 17). Dr. Nwaobasi noted that the right foot showed areas of necrosis and ischemic soft tissue (*Id.*). He ordered the dressing on Adams's feet to be changed every day; he did not prescribe any new medications for Adams and instead stated "continue orders for control of [hypertension] and [diabetes mellitus]" (*Id.* at pp. 15–17).

On April 4th, Dr. Trost saw Adams and noted that he was refusing to take Metformin or insulin and refusing his accuchecks (Doc. 102-5, p. 18). Dr. Trost noted that Adams's diabetes was "poorly controlled," and his A1C was 10.9 (*Id.*). After being

warned of the risks of non-compliance, including loss of limbs, Adams agreed to take the Metformin and to do the accuchecks (*Id.*). Dr. Trost ordered accuchecks three times per day and also ordered an antibiotic for possible infection (*Id.*).[6] Later that day, however, Adams had a hyperglycemic incident with blood sugar of 391—which is very high—and agreed to take his insulin (*Id.* 20–21). The next day, Adams's blood sugar dropped to 143 (*Id.* at p. 21).

A day after that, Dr. Nwaobasi saw Adams at 8:50 a.m. and performed minimal debridement of the wounds (Doc. 102-5, p. 22). The doctor noted that Adams was non-compliant and had been refusing to take insulin for control of his diabetes (*Id.*). Several hours later, Dr. Nwaobasi was notified that Adams's blood sugar was high and he ordered ten units of insulin to be followed by a blood sugar check six hours later (*Id.* at p. 23). Later that night, his blood sugar level was 450, but Adams refused to take his insulin despite being warned of the dangers of "hyperglycemia and post wound healing" (*Id.* at p. 25). Dr. Trost was informed but did not enter any new orders; instead, he opted to see Adams the following morning (*Id.*). At 2:40 a.m., Adams's blood sugar level was 422, and Dr. Trost was informed (*Id.* at pp. 25, 26). Dr. Trost then saw Adams at 7:50 a.m.; the notes from the visit mention only Adams's burn wounds and say nothing about his diabetes (*Id.* at p. 27). For the next few days, Adams continued to refuse his insulin, despite being repeatedly counseled that his wounds would not heal if his blood sugar was high (*Id.* at pp. 28–32).

---

[6] Beginning April 6, 2014, Adams's blood sugar was tested three times a day. Prior to April 2014, Adams's blood sugar was tested in the mornings every week (Doc. 109-10, p. 4). In May 2014, it was tested twice a day until Adams's transfer on June 11, 2014 (*Id.*).

On April 9th, Dr. Nwaobasi debrided Adams's wounds and noted he had "poor or non compliance with management of his [diabetes]" (Doc.102-5, p. 32). It appears that Adams began taking his insulin again that same day (*see* Doc. 102-6, p. 2). On April 10th, Dr. Fuentes saw Adams and noted his right big toe was "gangrenous," and parts of his second and third toes were "turning black" (Doc. 102-6, p. 1). The same wound care was continued, and Adams was referred to have his toe amputated (*Id.*). The next day, Dr. Trost noted that although Adams's right big toe was gangrenous, his burn wounds were healing well (*Id.* at p. 2). On April 12th, Dr. Nwaobasi saw Adams and changed the dressings on his wounds (Doc. 102-6, p 3). By April 13th, Adams was again refusing to take his Metformin and the antibiotics that had recently been prescribed because he claimed they made him vomit (Doc. 102-6, pp. 4–13; Doc. 102-12). His refusal continued for the next nine days (*see* Doc. 102-6, Doc. 102-12).

On April 16th, Adams was evaluated by Dr. Robert Brewer at Southern Illinois Hospital, who recommended amputation of the toe (Doc. 102-9).[7] Dr. Nwaobasi changed the dressing on Adams's wounds on April 18th, and Dr. Fuentes did so on April 19th, 21st, and 22nd (Doc. 102-6, pp. 9, 11, 14, 15). Dr. Nwaobasi saw Adams on April 23, 2014, and noted that they were waiting on referral for possible amputation (*Id.* at p. 16). He had no further meaningful contact with Adams after that date.[8]

---

[7] The report indicates that Adams "has a gangrenous toe on the l foot." The Court assumes (or rather hopes) this was a typo as there appears to be no dispute that the correct toe was in fact amputated.

[8] Adams was brought to an emergency room on April 25, 2014 for "anterior chest discomfort," excessive heart rate, and a possible infection (Doc. 102-10). It appears that he did not have a negative heart event, and his heart rate was reduced with medication (*Id.*).

On April 29, 2014, Dr. Fuentes indicated that Adams had no complaints at 8:10 a.m., but by 9:45 a.m., Adams was found on the floor and unresponsive (Doc. 102-6, pp. 22-24). The nurse's notes indicate that Adams's blood sugar levels were 58 at 9:45 a.m. and rose to 158 by 10:15 a.m. after measures were taken (*Id.*). Adams reported that he had not eaten his lunch tray, and the nurse educated him on eating after taking insulin (*Id*). Dr. Trost was informed (Doc. 109-21, p. 1).[9] Adams refused insulin the next morning at 2:20 a.m. because his blood sugars were low at 66, and he refused again on May 2, 2014 (*Id*. at p. 25; Doc. 102-6, p. 27).

Adams's toe was amputated on May 5, 2014. The following day while Adams was still at the hospital, his blood sugar level was 28; he was given food and dextrose, which raised his blood sugar to 148 (Doc. 109-20). He was discharged the same day with instructions to follow up in two weeks (Doc. 102-11). Adams had another episode of low blood sugar (61 and 55) on May 7th and was again educated on the necessity of eating after taking insulin (Doc. 102-6, p. 29). As noted above, Adams was transferred from Menard on June 11, 2014.

**B. Legal Standards**

The standard applied to summary judgment motions under Federal Rule of Civil Procedure 56 is well-settled and has been succinctly stated as follows:

> Summary judgment is appropriate where the admissible evidence shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. A "material fact" is one identified by the substantive law as affecting the outcome of the suit. A

---

[9] Dr. Barkoff indicated that Adams had two episodes of hypoglycemia in April 2014 (Doc. 116-2). However, the medical records only show that this one episode occurred in April.

> "genuine issue" exists with respect to any such material fact . . . when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." On the other hand, where the factual record taken as a whole could *not* lead a rational trier of fact to find for the non-moving party, there is nothing for a jury to do. In determining whether a genuine issue of material fact exists, we view the record in the light most favorable to the nonmoving party.

*Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (citations omitted).

In order to prevail on a claim for deliberate indifference to a serious medical need, there are "two high hurdles, which every inmate-plaintiff must clear." *Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165 F.3d 587, 590 (7th Cir. 1999). First, the plaintiff must demonstrate that his medical condition was "objectively, sufficiently serious." *Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005) (citations and quotation marks omitted). Second, the plaintiff must demonstrate that the "prison officials acted with a sufficiently culpable state of mind," namely deliberate indifference. *Greeno*, 414 F.3d at 653.

There is no question that Adams's diabetes and the injuries to his feet constituted serious medical conditions. Thus the only question for the Court is whether Dr. Nwaobasi acted with deliberate indifference with respect to Adams's conditions.

In order to show that prison officials acted with deliberate indifference, a plaintiff must put forth evidence that the prison officials knew that the prisoner's medical condition posed a serious health risk, but they consciously disregarded that risk. *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Id.*; *accord Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("Deliberate indifference is intentional or reckless conduct, not mere negligence."); *McGowan v. Hulick*, 612 F.3d 636,

640 (7th Cir. 2010) ("[N]egligence, even gross negligence does not violate the Constitution.")

For a medical professional to be held liable under the deliberate indifference standard, he or she must respond in a way that is "so plainly inappropriate" or make a decision that is "such a substantial departure from accepted professional judgment, practice, or standards," that it gives rise to the inference that they intentionally or recklessly disregarded the prisoner's needs. *Holloway*, 700 F.3d at 1073; *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008) (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). In other words, a prison medical professional is "entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Sain*, 512 F.3d at 894–95). *See also Holloway*, 700 F.3d at 1073 ("There is not one 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field." (quoting *Jackson v. Kotter,* 541 F.3d 688, 697 (7th Cir. 2008))).

**C. Analysis**

From the parties' briefs, there appears to be no dispute that Dr. Nwaobasi appropriately treated Adams's external foot conditions—the blister and ulcers that formed in 2013 and 2014 that required debridement, antibiotics, and dressings—while he was housed at Menard (*see* Doc. 102, Doc. 109, Doc. 116). The medical records show that his blisters and ulcers were routinely and frequently treated and checked, and there is no evidence that the treatment protocol followed by Dr. Nwaobasi was improper. There is

also no evidence that Dr. Nwaobasi was involved with or deliberately indifferent as to Adams's toe amputation, at least with respect to the procedure itself.

Adams argues, however, that Dr. Nwaobasi's treatment fell short because he did nothing to treat the underlying cause of Adams's foot problems: his diabetes (Doc. 116). During the relevant time period, the medical records reveal that there were numerous medical service providers who were involved in Adams's care, including Dr. Robert Shearing, Dr. Samuel Nwaobasi, Dr. John Trost, and Dr. Fe Fuentes. It is clear from the records, however, that Adams's diabetes was primarily being managed by Dr. Trost and the diabetes clinic, and on occasion, by Dr. Fuentes. For instance, the standing orders for Adams's diabetes medications and blood sugar testing were issued by the diabetes clinic, or Dr. Trost and Dr. Fuentes when necessary; Dr. Trost was the physician routinely notified by nurses of hypo and hyperglycemic events; and each time Adams refused his diabetes treatment, Dr. Trost or Dr. Fuentes were listed as the attending physician responsible for explaining to Adams the risks, possible complications, and probable consequences (*see* Doc. 102-4, pp. 9, 11; Doc. 102-6, pp. 18–19, 20, 21, 25, 26, 28, 30; Doc. 102-12, p. 2, 5, 7–35).

On the other hand, Dr. Nwaobasi argues that, as a surgeon, he was only tasked with caring for Adams's external foot condition, and he was not responsible for management of Adams's diabetes (Doc. 102, Doc. 109). It is clear from the medical records that Dr. Nwaobasi's involvement with Adams's diabetes was extremely limited. Specifically, when Adams first arrived at Menard in January 2013, Dr. Nwaobasi reviewed Adams's chart after Adams complained he was not getting his insulin and

then referred Adams to the diabetes clinic. This is consistent with his testimony that he would not handle patients with poorly controlled diabetes and would instead refer the patient to his colleague because it is a medical issue "beyond [his] capability" (Doc. 116-5, pp. 13, 46). Then in April 2014, Dr. Nwaobasi ordered reactionary insulin on one occasion after being informed by a nurse that Adams's blood sugar was high. There is also no evidence that Adams specifically sought care for his diabetes (or hypo/hyperglycemic events) from Dr. Nwaobasi or that he complained to Dr. Nwaobasi about the care he was receiving from Dr. Trost or Dr. Fuentes.

The medical records instead make very clear that Dr. Nwaobasi's primary role in Adams's care was with respect to the wounds on his feet. Each visit that Dr. Nwaobasi had with Adams was spent debriding his wounds and/or changing the dressings. In fact, Dr. Nwaobasi was the only physician at Menard who debrided the wounds. Adams does not dispute that, because of his surgical background, Dr. Nwaobasi was specifically asked by his colleagues to perform the debridement (*see* Doc. 116). While Dr. Nwaobasi was aware that Adams had diabetes, and noted as much in his medical record entries, he also was aware that it was being primarily managed and treated by Dr. Trost.

Adams nonetheless argues that Dr. Nwaobasi should have done more in light of Adams's poorly controlled diabetes, especially when he was aware of hypo and hyper glycemic events (Doc. 116, p. 18). To support this contention, Adams relies almost exclusively on his expert, Dr. Marla Barkoff (Doc. 116). Dr. Barkoff's ultimate conclusion is that:

> [Plaintiff's] team of nurses and doctors failed to properly treat [his] diabetes through diet, failed to properly manage [his] glycemic control, and failed to properly prevent, recognize, and treat complications from diabetes including problems with [his] kidney function, peripheral neuropathy, and peripheral vascular disease.

(Doc. 116-2, p. 4). Such a conclusion may be sufficient in a medical malpractice case against the entire medical staff at Menard, but it is insufficient in this matter because Dr. Nwaobasi cannot be held liable for the actions of other medical providers. There is no *respondeat superior* liability in Section 1983 litigation; liability is premised on the personal actions of each defendant. *See Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001).

Almost all of the actions discussed by Adams were taken by providers other than Dr. Nwaobasi (*compare* Doc. 116, pp. 17–18 and Doc. 116-2 *with* Docs. 102-4, 102-5, and 102-6). With respect to Dr. Nwaobasi's personal actions, Adams claims the doctor was deliberately indifferent by failing to mention in his April 30th note the hypoglycemic event that occurred the day before (Doc. 116-2, p. 16; Doc. 109-1, p. 14; Doc. 102-6, p. 25). As Defendant's expert Dr. Daniels noted, however, there was no need for Dr. Nwaobasi to make note of the prior day's events when the purpose of his visit was to check on the status of Adams's foot wounds, and the hypoglycemic event had already been addressed by Dr. Trost and the nursing staff (Doc. 109-3, p. 4). To the extent the hypoglycemic event necessitated a change in medication (*see* Doc. 109-2, p. 2; *but see* Doc. 109-3, p. 4), there is no reason to think Dr. Nwaobasi would be the one to make that call or had the expertise to do so. *See Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1074 (7th Cir. 2012) ("prison physician, as the inmate's acting primary care doctor, is free to make his own, independent medical determination as to the necessity of certain

treatments or medications, so long as the determination is based on the physician's professional judgment and does not go against accepted professional standards.")

Adams also claims that Dr. Nwaobasi was deliberately indifferent because he was unaware of whether Adams's blood sugar was being monitored, he did not monitor his blood sugar logs, and he took no effort to "coordinate" his "glycemic control" with other healthcare providers (Doc. 116, p. 18; Doc. 116-2, p. 20). Dr. Barkoff opined that Dr. Nwaobasi's "[f]ailure to acknowledge and optimize [Plaintiff's] glycemic control while managing a skin injury and infection is against standard medical practice for a caring [sic] for a diabetic patient with a skin injury and likely contributed to [Plaintiff's] poor wound healing, gangrene, and eventual amputation" (Doc. 116-2, p. 20).

But once again, the record here reveals that Dr. Nwaobasi was not Adams's primary physician; rather, he was acting as a surgical specialist and was tasked with the specific treatment of Adams's external foot problems. There is no evidence that Adams appeared to be in acute distress or complained about his diabetes not being managed during any of his visits with Dr. Nwaobasi. There is also no reason to think that isolated instances of hypo or hyperglycemic incidents would have alerted a reasonable doctor in Dr. Nwaobasi's position to question the treating physician's treatment plan, especially when the doctor is aware that the patient is uncooperative with the treatment plan. Doctors are entitled to deference in their treatment plans; in this case, Dr. Nwaobasi is entitled to deference on his decision to defer to the treatment plan formulated and put into effect by the medical providers who oversaw the management of Adams's diabetes: the diabetes clinic, Dr. Trost, and Dr. Fuentes. *See Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir.

2011). No jury would find that Dr. Nwaobasi's reliance on Dr. Trost's judgment was "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). There is simply no evidence that Dr. Nwaobasi drew the inference that a serious risk of harm existed that was not being adequately treated.

## CONCLUSION

For the reasons set forth above, the Motion for Summary Judgment filed by Defendant Samuel Nwaobasi on May 16, 2016 (Doc. 101) is **GRANTED**, and the Motion to Strike Reply filed by Plaintiff Byron E. Adams on October 21, 2016 (Doc. 120) is **DENIED.**

This matter shall proceed on Count 1 alleging deliberate indifference as to Defendant Harrington and Count 2 alleging excessive force as to Defendant Stirnaman.

**IT IS SO ORDERED.**

**DATED:  January 24, 2017**

                                                                                      *Nancy J. Rosenstengel*

                                                                                      **NANCY J. ROSENSTENGEL**
                                                                                      **United States District Judge**