## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **BYRON E. ADAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:14-CV-366-NJR-DGW** |
| | ) | |
| **RICHARD HARRINGTON and** | ) | |
| **BRADLEY J. STIRNAMAN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM AND ORDER</u>

**ROSENSTENGEL, District Judge:**

Currently pending before the Court is the Motion for Partial Summary Judgment filed by Defendant Richard Harrington on August 29, 2016 (Doc. 110). For the reasons set forth below, the motion is granted in part and denied in part.

### INTRODUCTION

Plaintiff Byron Adams is an inmate in the Illinois Department of Corrections ("IDOC") who was formerly incarcerated at Menard Correctional Center. He alleges that he suffered second degree burns on the bottoms of his feet from the floor of his cell, which was dangerously hot because of deteriorating steam pipes that ran underneath the floor. Adams asserted claims against Richard Harrington, the former warden at Menard, for deliberate indifference to his serious medical needs and for unconstitutional conditions of confinement (Doc. 34). Adams sued Warden Harrington in both his individual and official capacities (Doc. 34).

The conditions of confinement claim was later dismissed because Adams failed to exhaust his administrative remedies prior to filing suit (Doc. 78). Warden Harrington has now moved for summary judgment on the deliberate indifference claim (Doc. 110). Adams concedes that summary judgment should be granted on the portion of the claim directed at Warden Harrington in his official capacity, because any claim for money damages is barred by sovereign immunity, and the request for injunctive relief is moot (Doc. 115, p. 2, n.1). Thus the only issue before the Court is whether summary judgment is appropriate on the deliberate indifference claim against Warden Harrington in his individual capacity.

### FACTUAL BACKGROUND

The following facts are undisputed except where noted. Byron Adams was incarcerated at Menard Correctional Center from January 9, 2013 to June 11, 2014 (Doc. 111-1). For most of that time period, Defendant Richard Harrington was the warden (Doc. 111-2).[1]

Menard uses a steam heating system to heat the prison in the winter (Doc. 115-1). Some of the pipes that carry the steam run underneath the concrete floors of the South Lowers Cell House at Menard (Doc. 115; Doc. 115-1). Those pipes have deteriorated, which allows steam to escape (Doc. 115; Doc. 115-1). Because there is no insulation in the floors of the South Lowers, the steam makes the floors hot during the winter months, particularly in gallery one, where Adams was housed (Doc. 115; Doc. 115-1; Doc. 115-2). According to Adams, the floor of his cell were extremely hot—"hot enough to cook a pot

---

[1] Harrington retired on April 16, 2014 (Doc. 111; Doc. 111-2). He was replaced by Kimberly Butler.

of beans on" or to heat water (Doc. 111-1). In evidence previously submitted to the Court, another inmate named Ronald Turner corroborated Adams's statements (Doc. 111-1; Doc. 54-3). Mr. Turner also stated that inmates in gallery one had to put their food in bags and hang them on the wall along with their laundry bags so that their belongings were not damaged (Doc. 54-3). He also stated that officers in charge of gallery one previously distributed fans, to help the inmates cope with the heat, and blankets, so the inmates could move around their cells and prop up their property boxes to prevent their belongings from being ruined (*Id.*). Finally, he stated that other inmates have been burned by the floors and have filed grievances about the temperature of the floors (*Id.*). Prison officials deny knowledge of these claims (Doc. 111-3; Doc. 115-2).

In November 2013, the Chief Stationary Engineer at Menard began to consider a large scale maintenance project to replace the plumbing and porcelain fixtures in the South Lowers and to fully repair the condensate piping (Doc. 115; Doc. 115-1). Given the scope of the project and the estimated cost—$5.7 million—the warden's approval was required for the project (Doc. 115; Doc. 115-1). The project was expected to begin in October 2014, but was put on hold because of the Illinois budget crisis (Doc. 115; Doc. 115-1). Instead, as a temporary fix, the Chief Stationary Engineer shut off the steam flowing through the condensate piping in late 2014 or early 2015, which remains off to this day (Doc. 115; Doc. 115-1).

That fix, however, came too late for Adams. Sometime in January 2014, Adams was transferred to cell 118 of the South Lowers (Doc. 111-1). Unfortunately, Adams has diabetes and suffers from various medical complications as a result of that disease,

including diabetic neuropathy (Doc. 111-1).[2] Because of the neuropathy, Adams was unable to feel the temperature of the floor through his feet (*Id.*). On January 27th, while watching TV in his cell, Adams noticed blood and pus in his socks (*Id.*). The next morning when he took his sock off, Adams saw "a big blister on the bottom of my foot and the skin was hanging off" (*Id.*). His cellmate called for help, a medtech and a lieutenant responded, and they immediately took Adams to the Health Care Unit (*Id.*). Adams was diagnosed with second degree burns (Doc. 130). Adams testified that he told a nurse in the Health Care Unit that the "floors burnt my feet" (Doc. 111-1). He spent a total of thirty-seven days in the Health Care Unit being treated for his burns (Doc. 130).

Adams was discharged from the Health Care Unit on March 5, 2014, and taken back to the South Lowers and placed in cell 114 (Doc. 111-1). He claims the floor in cell 114 was as hot as the floor in his previous cell (Doc. 111-1). Within a couple of days, he had again burned his feet on the floor (*Id.*). He returned to the Health Care Unit for treatment on March 11th and remained there until he was transferred out of Menard in June 2014 (*Id.*).

Following the January incident, an incident report was filled out indicating that Adams was taken to the Health Care Unit with burns on his feet (Doc. 111-2). Warden Harrington admitted that he signed the incident report (*Id.*). Warden Harrington claims the incident report did not mention Adams's claim that the burns came from the floor of

---

[2] Adams's medical condition was fully set forth in this Court's previous Order on Defendant Samuel Nwaobasi's motion for summary judgment (Doc. 130).

his cell (Doc. 111, pp. 4, 7).[3] Regardless, Adams testified that a day or two after he was admitted to the Health Care Unit, an Internal Affairs officer came to speak to him about his injury, which Warden Harrington does not dispute (*see* Doc. 111). Adams testified that he told the officer that he burned his feet on the floor of his cell, and the officer then went to the cell to check the floor himself (*Id*.). Adams said the officer returned to the Health Care Unit and confirmed that the floor was, in fact, very hot (*Id*.)

Adams also testified that following the January incident he wrote three or four letters to Warden Harrington (Doc. 111, p. 4 ¶28; Doc. 111-1, p. 48). In these letters, Adams talked about the burns to his feet and the incident involving Defendant Bradley Stirnaman (Doc. 111-1, p. 49). He also mentioned that he was diabetic (*Id*.). Warden Harrington, of course, denied seeing these letters (Doc. 111-2).

Adams also submitted an emergency grievance on March 18, 2014 (Doc. 1-1, p. 3; Doc. 111, p. 5 ¶30; Doc. 115, p. 6 ¶21). Under the IDOC's grievance procedures, an emergency grievance is supposed to go straight to the warden (Doc. 111-2). The grievance states that he burned his feet on the hot floor in cell 118 on January 27, 2014, that he is a diabetic and has neuropathy, and that he burned his feet again in cell 114 on March 5, 2014 (Doc. 1-1, pp. 3-4). Adams requested "a special shoe to wear" and to be taken to an outside hospital so that "my feet can be treated right" (*Id*.). Again, Warden Harrington denied seeing this grievance (Doc. 111-2).

---

[3] For some reason, the incident report was not submitted to the Court, even though it undoubtedly exists—a copy of it was presented to Warden Harrington at his deposition (*see* Doc. 111-2, p. 20).

<u>DISCUSSION</u>

The standard applied to summary judgment motions under Federal Rule of Civil Procedure 56 is well-settled and has been succinctly stated as follows:

> Summary judgment is appropriate where the admissible evidence shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. A "material fact" is one identified by the substantive law as affecting the outcome of the suit. A "genuine issue" exists with respect to any such material fact . . . when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." On the other hand, where the factual record taken as a whole could *not* lead a rational trier of fact to find for the non-moving party, there is nothing for a jury to do. In determining whether a genuine issue of material fact exists, we view the record in the light most favorable to the nonmoving party.

*Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (citations omitted).

Before discussing whether Adams can survive summary judgment on his deliberate indifference claim, the Court will first discuss the relationship between this claim and the conditions of confinement claim, which again, has already been dismissed. The Court believes this discussion will be helpful, because it was a bit challenging to discern the line between Adams's conditions of confinement claim and his deliberate indifference claim, given that they both involve (to some degree) the dangerously hot floor in Adams's cell.

As the Court sees it, the conditions of confinement claim against Warden Harrington is based on the allegations that Adams was subjected to an excessively hot floor in his cell, which the warden knew about but failed to address—even though the risk of physical harm from the hot floor was obvious (particularly for an inmate who suffered from diabetic neuropathy in his feet). This claim could have been asserted by

any inmate housed in gallery one of the South Lowers. The deliberate indifference claim is a spin-off of the conditions of confinement claim and arose after Adams burned his feet on the hot floor as a result of his diabetic neuropathy. The deliberate indifference claim is unique to Adams. Adams alleges that the burns, along with his diabetes and corresponding neuropathy, constitute serious medical conditions. Adams further alleges that the warden knew about his medical conditions but was deliberately indifferent to them when he failed to ensure that Adams was not returned to a cell with a hot floor, failed to ensure Adams was receiving adequate medical care, and failed to refer Adams to an outside physician.

The Court acknowledges that the portion of the deliberate indifference claim regarding Adams's return to a cell with a hot floor could be characterized as a conditions of confinement claim. That is, the hot floor posed an unsafe condition of confinement, which was made even more unsafe because Adams suffered from diabetic neuropathy and was still recovering from the burns he had already sustained when he was returned to a cell with a hot floor. Given the circumstances of this case and the interplay between his medical conditions and the condition of his cell, however, the Court believes this portion of the claim can also be appropriately framed as a claim for deliberate indifference to a serious medical need.

Now on to the merits of the deliberate indifference claim. In order to prevail on a claim for deliberate indifference to a serious medical need, there are "two high hurdles, which every inmate-plaintiff must clear." *Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165 F.3d 587, 590 (7th Cir. 1999). First, the plaintiff must demonstrate that his medical

condition was "objectively, sufficiently serious." *Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005) (citations and quotation marks omitted). Second, the plaintiff must demonstrate that the "prison officials acted with a sufficiently culpable state of mind," that is, they were deliberately indifferent to his medical condition. *Greeno*, 414 F.3d at 653.

Warden Harrington does not dispute that Adams's diabetes and the burns to his feet constituted serious medical conditions (*see* Doc. 111). Thus the only question for the Court is whether Warden Harrington acted with deliberate indifference with respect to these conditions. Deliberate indifference "requires more than negligence and it approaches intentional wrongdoing." *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012); *accord Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("Deliberate indifference is intentional or reckless conduct, not mere negligence."); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[N]egligence, even gross negligence, does not violate the Constitution."). A prison official acts with deliberate indifference if he knows of a serious risk to the prisoner's health and consciously disregards that risk. *Holloway*, 700 F.3d at 1073. Put differently, the prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and "must also draw the inference." *Greeno*, 414 F.3d at 653 (citation omitted).

Non-medical staff at the prison, such as Warden Harrington, are "entitled to defer to the judgment of jail health professionals so long as [they] did not ignore [the prisoner]." *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (alterations in original) (quoting *Berry,* 604 F.3d at 440). *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011)

("Non-medical defendants cannot simply ignore an inmate's plight."); *see also Greeno,* 414 F.3d at 656 (stating that "[p]erhaps it would be a different matter if [the non-medical defendant] had ignored Greeno's complaints entirely, but we can see no deliberate indifference given that he investigated the complaints and referred them to the medical providers who could be expected to address Greeno's concerns."). "The only exception to this rule is that nonmedical officers may be found deliberately indifferent if 'they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.'" *King,* 680 F.3d at 1018 (citing *Hayes v. Snyder,* 546 F.3d 516, 527 (7th Cir. 2008)).

Warden Harrington argues that he cannot be found deliberately indifferent because he "was not sufficiently aware of Plaintiff's medical ailments" (Doc. 11, p. 8). However, the incident report signed by Warden Harrington demonstrates he knew about Adams's burns. *Gray v. Hardy,* 826 F.3d 1000, 1008 (7th Cir. 2016). There is also evidence from which a rational jury could conclude Warden Harrington knew about Adams's diabetes and neuropathy. Adams testified that he sent a number of letters to Warden Harrington after he burned his feet in January 2014 that indicated, in part, that he was diabetic (Doc. 111, p. 4 ¶21; Doc. 111-2). Adams also submitted an emergency grievance, which would have gone directly to Warden Harrington, after he burned his feet for the second time in March 2014 (Doc. 1-1, pp. 3–4). He explicitly says in the grievance that he is "a diabetic with <u>NEUROPATHY</u> to my feet with no feeling" (Doc. 1-1, p. 3; Doc. 111-1). Warden Harrington claims he never received any of Adams's letters or the grievance, but a jury is entitled to disbelieve that claim.

Even if it was true that Warden Harrington never saw Adams's letters or his grievance, a jury could still infer that he was aware of Adams's diabetes and neuropathy. Warden Harrington indisputably knew about Adams's burns given that he signed an incident report describing them. One would think that after being notified an inmate was found *in his cell with second degree burns* the warden would want to know how such an injury could have possibly occurred in his facility. It is simply not believable that the warden shrugged it off and did not make any attempt to investigate. In turn, it is patently evident that even the most cursory investigation would include asking why Adams was the only inmate on gallery one who sustained burn injuries from the hot floor and/or why on earth his injury was so severe. The answer to both of those questions is because he suffered from diabetic neuropathy. Simply put, it would not be difficult for a jury to conclude that Warden Harrington must have known about Adams's diabetic neuropathy.

Warden Harrington next argues that he was not deliberately indifferent when Adams was discharged from the Health Care Unit back to the South Lowers because the warden was not aware that the cell floors were allegedly hot, and there is no evidence that they actually were hot (Doc. 111, pp. 3, 9). First, there is plenty of evidence that the floors were hot; there is Adams's testimony, Ronald Turner's testimony, and the Chief Stationary Engineer's testimony. Second, no rational jury would believe that Warden Harrington was unaware of the hot floors. There was the pending repair project. Adams also told an Internal Affairs officer that the burns on his feet were from the floor of his cell, and the officer admitted the floors were hot after checking them himself (Doc.

111-2). And Dr. Samuel Nwaobasi testified that he was "sure" the warden was made aware that Adams burned his feet on the cell floor because Dr. Nwaobasi or one of the other doctors in the Health Care Unit "must have" reported it (Doc. 116-5, p. 27). But even without those things, a jury could still infer that Warden Harrington knew about the hot cell floors because the warden can realistically be expected to know about major infrastructure problems at his facility. *See Gray v. Hardy*, 826 F.3d 1000, 1008 (7th Cir. 2016) (holding jury could infer that warden was aware of pest infestations at the prison); *Sanders v. Sheahan*, 198 F.3d 626, 629 (7th Cir. 1999) ("defendants such as the Sheriff and the Director of the Jail can realistically be expected to know about or participate in creating systematic jail conditions" such as "inadequate hygiene").

A jury that credits Adams's evidence and believes that Warden Harrington knew about the hot floors, knew about Adams's burns, and knew about Adams's diabetic neuropathy could also find that the warden was deliberately indifferent. Specifically, a rational jury could conclude that after Adams burned his feet the first time, Warden Harrington should have been compelled to ensure that Adams was not returned to a cell with a hot floor after he was discharged from the Health Care Unit. But there is no evidence that Warden Harrington took any action whatsoever. A rational jury could also conclude that after Adams burned his feet a second time and submitted his emergency grievance, Warden Harrington should have been compelled to verify that Adams was in fact removed from the South Lowers and was receiving medical care. But again, there is

no evidence that Warden Harrington took any action whatsoever.[4] Consequently, the Court believes Adams has demonstrated a triable issue of fact as to whether Warden Harrington was deliberately indifferent with respect to Adams's burn injuries.

The Court finds the opposite is true, however, with respect to the treatment of Adams's diabetes. There is no dispute that Warden Harrington generally has no knowledge about diabetes or diabetes care and that he defers to the judgment of the medical staff at Menard. And there is nothing from which a rational jury could conclude that Warden Harrington had reason to question that judgment. In particular, when Adams testified about the contents of the letters he wrote to the warden, he in no way suggested that his diabetes was not being treated appropriately (*see* Doc. 111-1). There is no indication that the incident report mentioned anything about the treatment Adams was receiving for his diabetes. And the March 2014 emergency grievance also was insufficient to inform the warden that intervention as to the treatment of Adams's diabetes was warranted. The grievance is all about Adams's burns and the care he was, or was not, receiving for his feet. While the grievance mentioned that Adams was diabetic, it was merely to inform the warden that his medical condition makes him susceptible to burns. It did not state that the care Adams was receiving for his diabetes was inadequate. Nor did it suggest that the inadequate medical care for his diabetes is what led to the burns. Accordingly, none of the communications to Warden Harrington

---

[4] This conclusion, of course, could only be reached if a jury believed that Adams in fact informed the warden of his condition—that his grievance was received and read by the warden. There is no evidence that Adams actually spoke to Warden Harrington about any of his concerns.

could have informed him that there was a risk of harm related to the medical care that Adams was receiving for his diabetes.

For these reasons, the Court concludes that Warden Harrington is entitled to summary judgment on the portion of Count 1 related to the medical treatment of Adams's diabetes, but not on the portion related to Adams's burn wounds. In light of this conclusion, the Court must address Warden Harrington's argument that he is protected by qualified immunity (Doc. 111, pp. 9–11).

"Generally, qualified immunity protects government agents from liability when their actions do not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 914 (7th Cir. 2011) (citing *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010)). "It protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015) (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)). In determining whether a defendant is entitled to qualified immunity, the Court must ask two questions: (1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Hernandez*, 634 F.3d at 914 (citing *Saucier v. Katz*, 533 U.S. 194, 201, 202 (2001)).

As set forth above, Adams has set forth enough facts for a jury to find that Warden Harrington violated his constitutional rights. And, as further set forth above, it has long been held that jail personnel cannot simply ignore an inmate's complaints about inadequate medical care. *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012); *Greeno v.*

*Daley*, 414 F.3d 645, 656 (7th Cir. 2005). Accordingly, Warden Harrington is not entitled to qualified immunity.

C<small>ONCLUSION</small>

For these reasons, the Motion for Partial Summary Judgment filed by Defendant Richard Harrington (Doc. 110) is **GRANTED in part and DENIED in part**. The Motion is **GRANTED** as to the portion of the deliberate indifference claim against Harrington in his official capacity. It is also **GRANTED** as to the portion alleging Harrington was deliberately indifferent to the medical care Adams received for his diabetes. It is **DENIED** as to as to the portion alleging Harrington was deliberately indifferent to Adams's burned feet.

This matter shall now proceed to trial on Count 1 alleging deliberate indifference against Defendant Harrington as to Adams's burned feet and on Count 2 alleging excessive force against Defendant Bradley Stirnaman.

**IT IS SO ORDERED.**

**DATED:   January 31, 2017**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**